910 P.2d 627

Dawn RUSTIN, Petitioner,

v.

**INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

Safeway Stores, Respondent Employer,

Safeway Stores, Respondent Carrier.

No. CV–94–0506–PR.

Supreme Court of Arizona.

Jan. 23, 1996.

Delaney & Melkonoff by Edgar M. Delaney, Phoenix, for Petitioner.

Anita R. Valainis, Chief Counsel, Industrial Commission of Arizona, Phoenix, for Respondent.

Jones, Skelton & Hochuli by J. Russell Skelton, Calvin Harris, Phoenix, for Respondent Employer/Carrier.

Day, Kavanaugh & Blommel, P.C. by Denise M. Blommel, Tempe, Amicus Curiae for Arizona Association of Lawyers for Injured Workers.

OPINION

ZLAKET, Justice.

On November 5, 1990, claimant Dawn Rustin sustained an injury while working for Safeway Stores as a meat wrapper. Safe-

way, a self-insured employer,[1] began paying workers' compensation benefits. In March 1991, with the claim still indeterminable because her injury was not medically stationary,[2] Rustin received a letter from Safeway inviting participation in a "voluntary employment separation program." This correspondence advised that "layoffs in some areas" might be necessary to meet projected wage reductions, and though it was "unlikely" that job classifications being offered voluntary separation would experience such terminations, the employer proposed that in exchange for "a one-time, gross lump sum payment" of $7,500, a participating employee would "1) agree to resign his/her employment; 2) sign a legal release of claims; and 3) agree not to reapply for employment with Safeway in the Phoenix division." Rustin entered into the program and left the company.[3]

In November 1991, claimant had surgery to stabilize her injury. She then began receiving temporary partial disability benefits from Safeway. Several months later, she was released for light-duty work but was unable to find employment. During this time, and despite claimant's ineligibility to reapply for employment because of the terms of her earlier "separation," Safeway hired a rehabilitation consultant to determine whether her pre-injury position as a meat wrapper remained suitable. The expert contacted claimant's physician to learn what job alterations, if any, would allow Rustin's return to the same type of work. After reviewing the doctor's recommendations, Safeway asserted that had Rustin been eligible for rehire, it would have been "able to accommodate [the required] modifications" while maintaining her pre-injury rate of pay. The company

later admitted that in the absence of its modified position, the claimant would have experienced a loss in earnings.[4]

In April 1992, Rustin was released from care by her physician. She was then medically stationary. The doctor concluded that she had a permanent disability and limited her activities accordingly. Two months later, the Industrial Commission found that although claimant suffered an injury resulting in disability, she had not experienced a reduction in her monthly earning capacity. It held that Rustin's voluntary termination of employment, rather than any medical limitations, precluded her from returning to the same or similar job without a loss of income.

Claimant requested a hearing. The administrative law judge agreed that "any loss [in earning capacity] which applicant has sustained is by reason of her voluntary retirement rather than her physical incapacity to perform work. . . ." After exhausting administrative review, claimant sought relief in the court of appeals. That court affirmed the finding.[5] We accepted review and now set aside the award.

■ The requirement of showing lost earning capacity lies with the claimant. *Arizona DPS v. Industrial Comm'n*, 176 Ariz. 318, 322, 861 P.2d 603, 607 (1993). "If and when the worker meets this initial burden of proof, it falls upon the employer or carrier to go forward with evidence demonstrating the availability of suitable employment and/or the lack of a causal relationship between the claimed loss of earning capacity and the injury." *Id.*

1. *See* A.R.S. § 23–961(A)(2).

2. *See* A.R.S. § 23–1047(A).

3. For some reason that the parties do not explain, the agreement itself has not been presented for our review. *Its terms, therefore, can only be gleaned from the offering letter and other bits of evidence in the record.*

4. Prior to the Industrial Commission hearing, the parties stipulated that claimant, working as a meat wrapper in a modified position in the Phoenix area, would have an average monthly earning capacity of $1039.92. Similar employment with

Safeway would have paid an average of $1800 based on its assertion that her pre-injury wage would not have been diminished. In spite of this stipulation, the employer steadfastly maintained that because any such difference in income was attributable to claimant's voluntary departure from the company, she sustained no compensable loss of earning capacity.

5. Although the decision was originally denominated an "opinion," the court of appeals subsequently ordered that it not be published. Thus, it bears no official citation to which we can refer.

■ There is no contention that claimant's proof was insufficient. In fact, Safeway agrees that the dispositive issue is whether it met the requirement of going forward with sufficient evidence to controvert claimant's showing. It argues that Rustin's inability to secure work at pre-injury wages was solely due to her voluntary participation in the employment separation program, by which she was precluded from being rehired in the modified position that would otherwise have been available.[6]

As the court of appeals noted, however, the parties agree that "there is suitable employment available with companies other than employer that would result in a loss of earning capacity to claimant."[7] It is virtually undisputed on this record that, absent the modified position Safeway allegedly was willing to provide, every store in the Phoenix area would have paid Rustin less than her pre-injury wage. Thus, while the task in these cases is usually "to determine as near as possible whether in a competitive labor market the subject in his injured condition can probably sell his services and for how much," *Zimmerman v. Industrial Comm'n*, 137 Ariz. 578, 583–84, 672 P.2d 922, 927–28 (1983) (citation omitted), the parties here have stipulated that in the competitive market, claimant could only have sold her services at a reduced wage rate.

Safeway claims, however, that Rustin's voluntary resignation and agreement never to work for its Phoenix division altered the "competitive market" and that this act was the sole cause of any loss in earning capacity. In support of its position, Safeway cites the following language from *Arizona DPS*:

If ... the injury and its sequelae play no part in the worker's inability to find suitable employment, there is no compensable loss of earning capacity.

. . . .

Termination reasons unrelated to the industrial injury, such as layoff, strike, economic conditions, or misconduct become significant only where the evidence demonstrates that they, rather than claimant's disability, caused the subsequent inability to secure work.

176 Ariz. at 323, 861 P.2d at 608. While the foregoing is a correct statement of law, there are serious flaws in Safeway's attempt to apply it here.

We believe the voluntary employment separation program was unrelated to Rustin's industrial claim. There is no evidence in the record that either party believed her compensation benefits would be affected by the separation agreement. Safeway admits that the offering letter had nothing to do with the pending claim and was sent state-wide to various classes of employees.[8] Additionally, the letter itself suggested that participation in the program would not affect Rustin's claim. It specifically stated that the payment received under the program would be "in addition to any ... benefits to which the employee would otherwise be entitled upon resigning." Even though this language may be open to differing interpretations, several well-settled principles of law lead us to conclude that the program terms could not have effectively extinguished Rustin's claim.

Claimant received $7500 for her agreement to retire and never reapply for a position with Safeway. This was the standard amount given to all participants in the program. Rustin did not get additional consideration for relinquishing her pending compensation claim. To permit a forfeiture under these circumstances would clearly undermine the goals of our workers' compensation laws. *See Wiley v. Industrial Comm'n*, 174 Ariz. 94, 100, 847 P.2d 595, 601 (1993) ("Primary purposes of the Act include compensating claimants for lost earning capacity, preventing claimants from

---

6. Although Safeway says it was willing to modify claimant's job, she was never offered the position.

7. *See supra* notes 4 and 5.

8. We also note that Safeway did not consider modifying its meat wrapper position until eleven months *after* the agreement that precluded claimant from working for the company and one full month prior to her being found medically stationary (which first allowed for a determination of earning capacity). These facts cast considerable doubt on any suggestion that a legally significant connection existed between the separation agreement and the compensation claim.

becoming public charges during any period of disability, relieving employees of the burden of compensable injuries, and diminishing litigation between claimants and employers or insurance carriers.") (internal citations omitted).

Although Arizona recognizes the validity of post-compensability settlements in workers' compensation cases, *Safeway Stores v. Industrial Comm'n*, 152 Ariz. 42, 730 P.2d 219 (1986), the voluntary retirement agreement relied upon by Safeway failed to comply with applicable legal requirements. We have insisted that such settlements "be made in the open, subject to Commission approval." *Id.* at 48, 730 P.2d at 225. The agreement here, insofar as it purported to affect Rustin's compensation claim, was clearly not made "in the open." As best we can tell from the record before us, it contained no specific reference to the industrial injury or claimant's future entitlement to benefits. Moreover, the agreement was never placed before the commission for approval and was first raised only as a defense to the pending claim.

Finally, in order to commute a benefit to a lump sum payment, parties need approval from the commission, A.R.S. § 23–1067, which was neither sought nor obtained here. Clearly, therefore, the agreement was not meant to be a settlement of Rustin's workers' compensation claim, and we will not permit such an unintended result. *See Fullen v. Industrial Comm'n*, 122 Ariz. 425, 595 P.2d 657 (1979) (compensation act is liberally construed to accomplish its purpose of protecting injured workers and compensating valid claims).

The Safeway position was realistically unavailable to Rustin at the time of the commission hearings.[9] *See Arizona DPS*, 176 Ariz. at 324, 861 P.2d at 609 ("Although [claimant] conceded that he was physically able to perform the duties of his previous employment . . ., that job was realistically unavailable to him" since he had been terminated for misconduct.) Thus, as in *Arizona DPS*, the question to be resolved was whether "[her]

inability to obtain other suitable employment [at pre-injury wage levels] was due, at least in part, to [her] physical disability." *Id.* The record, unfortunately, is devoid of evidence on this subject, presumably because of the employer's preoccupation with claimant's earlier voluntary separation. Because the administrative law judge seems to have adopted a similarly narrow focus, we vacate his award.

The court of appeals and Safeway have suggested that this matter is similar to *Zimmerman v. Industrial Comm'n*, 137 Ariz. 578, 672 P.2d 922 (1983). In that case, the claimant moved to Utah following his medical release without first making an attempt to find work in Tucson, where the injury had occurred. He moved because of his personal belief that a small town would be better for him. We held, among other things, that "where the claimant voluntarily moves from the labor market where the injury was sustained, findings regarding his loss of earning capacity may be based on the job market in either his new residence or in the locality where the injury was sustained." *Id.* at 581, 672 P.2d at 925.

By analogy, it is argued here that since Rustin voluntarily limited the available market pool by excluding herself from the modified Safeway position, that job can still be used to determine lost earning capacity. We remain unpersuaded. In *Zimmerman*, the employer played no part in the claimant's decision to relocate. There was no encouragement on its part, and it did not receive any benefit from the move. Here, Safeway not only solicited the retirement but presumably gained from a reduction in payroll expense. Then, long after the fact, Safeway claimed that it would have retained Rustin in a modified position at the same wage.

We believe the facts here more closely resemble those of *Arizona Public Service Co. v. Industrial Comm'n*, 145 Ariz. 117, 700 P.2d 504 (Ct.App.1985). While the claimant in that case was drawing temporary total disability benefits, he participated in an early

---

9. "Loss of earning capacity is determined as of the time of the hearing." *Arizona DPS*, 176 Ariz. at 324 n. 4, 861 P.2d at 609 n. 4 (citing *Maness v.*

*Industrial Comm'n*, 102 Ariz. 557, 558, 434 P.2d 643, 644 (1967)).

retirement plan that disqualified him from future employment with Arizona Public Service (APS). Shortly thereafter, when his status changed to allow a return to light work, APS discontinued benefits. The claimant protested. At the hearing, APS argued that had he not retired, claimant could have returned to work in a different position without a loss in his average monthly wage. Therefore, it asserted, he was not entitled to benefits. The court of appeals rejected this argument and held:

> APS encouraged voluntary early retirement, the inevitable effect of which, if accepted, was to preclude further employment of claimant by APS. By offering retirement, which claimant had the right to accept, APS cannot rely upon the full paying job it would have provided for claimant had he not retired. The retirement, therefore, cannot serve as an argument that claimant limited the available job market or voluntarily quit. The claim ... for lost earning capacity during the period of temporary partial disability is not thereby lost.

*Id.* at 119, 700 P.2d at 506. We agree with this reasoning. Here, Safeway encouraged the retirement, and Rustin had a right to accept it. Safeway cannot now restrict the inquiry to a job it claims would have been available at pre-injury wage levels but for the retirement.

We therefore vacate the court of appeals' opinion and set aside the award.

FELDMAN, C.J., MOELLER, V.C.J., and CORCORAN and MARTONE, JJ., concur.